Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 11, 2003        Decided April 15, 2003

No. 02-1021

TOWN OF CAVE CREEK, ARIZONA, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION AND
DEPARTMENT OF TRANSPORTATION,
RESPONDENTS

On Petition for Review of an Order of the
Federal Aviation Administration

*Thomas D. Roth* argued the cause and filed the briefs for petitioner.

*Lisa E. Jones*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *Andrew C. Mergen*, Attorney.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: This case predominantly involves changes to high-altitude arrival and departure procedures to the north, northeast, and northwest of the Phoenix Sky Harbor International Airport ("PHX"). These changes were necessitated by the massive growth of passenger demand at PHX over the past 30 years. This growth resulted in imbalanced airline routes to and from PHX, outdated arrival and departure procedures, overburdened airspace configurations, and increased air traffic complexity. As a consequence of these problems, operational errors also increased. In response to Congress' National Airspace Redesign ("NAR") mandate and related agency studies, the Federal Aviation Administration ("FAA") developed the Northwest 2000 Plan to improve the management and safety of flights arriving from and departing to the north of PHX.

As part of the environmental review of the Northwest 2000 Plan, the FAA issued a Final Environmental Assessment ("EA") and Finding of No Significant Impact Record of Decision ("FONSI"). The EA and FONSI concluded that the environmental impact of the Northwest 2000 Plan would be insignificant. Because a comprehensive Environmental Impact Statement ("EIS") is only required by the National Environmental Policy Act ("NEPA") when the agency's action will "significantly affect[ ] the quality of the human environment," 42 U.S.C. § 4332(2)(C), the FAA decided that preparation of an EIS was unnecessary. *See also* ROBERT V. PERCIVAL ET AL., ENVIRONMENTAL REGULATION: LAW, SCIENCE AND POLICY 840-42 (3d ed. 2000) (providing an overview of the origins and development of the EIS requirement); Susannah T. French, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 CAL. L. REV. 929, 945-48 (1993) (same). Petitioners, Town of Cave Creek, Arizona, *et al.* – representing municipal entities surrounding PHX, and their inhabitants – seek review of the EA and FONSI. Petitioners contend that the FAA should be required to prepare an EIS

because the agency failed to give adequate consideration to certain criteria that agencies are obliged to address in determining whether a proposed action will significantly affect the environment.

We deny the petition for review. In preparing the EA and FONSI, the FAA properly employed a well-established methodology. Petitioners raise only nominal challenges to the agency's methodology and findings, and their other arguments lack merit. It is obvious that, after the Northwest 2000 Plan, the noise levels in the challenged areas will be compatible with all existing land uses in these areas, including residential housing, churches, and recreational parks. We therefore conclude that the FAA adequately considered the relevant criteria, and that the agency reasonably concluded that preparation of an EIS was unnecessary.

## I. BACKGROUND

### A. The Need for New Arrival and Departure Procedures at PHX

PHX was purchased by the City of Phoenix in 1935. It is now the country's fifth busiest airport. Due in part to the extraordinary growth of the Phoenix metropolitan area, passenger use at PHX has tripled twice in the past 50 years. *See, e.g.*, *Windermere, Scott See Arizona as Hot Market*, PUGET SOUND BUS. J., Aug. 31, 2001, at 23 (quoting a businessman's statement that the greater Phoenix area is "a phenomenal growth area for the United States").

PHX consists of 3,130 acres located in the southeast corner of the incorporated City of Phoenix. PHX has three parallel runways oriented in an east-west configuration. Depending on the wind and weather patterns, the airport operates either in "west flow" (where aircraft depart PHX to the west and arrive from the east) or "east flow" (where aircraft depart PHX to the east and arrive from the west). Generally, winds dictate that the airfield operates in east flow in the morning and west flow in the afternoon.

Aircraft at PHX follow published arrival procedures ("STARs") and departure procedures ("DPs"). Under PHX's old procedures, aircraft bound for PHX arrived from the north along two main flight paths (KARLO STAR and FOSSL STAR), and north and northeast departures from PHX proceeded along four routes (EAGUL DP, DRAKE DP, ST JOHNS DP, and DRYHEAT DP).

Because PHX is located in southwest Arizona, more aircraft arrive from and depart to the north and east of the airport than to the south or west. Before the Northwest 2000 Plan, the number of northern routes, the proximity of certain routes to others, and the increases in eastbound departures created route conflicts, inefficiencies, and operational errors within Albuquerque Air Route Traffic Control Center ("ARTCC") and the Phoenix Terminal Radar Approach Control ("TRACON") airspace. For example, the high volume of air traffic in Albuquerque's ARTCC Sector 38 created procedural complexities for controllers, in turn increasing PHX's departure delays, flight times, and flight distances. High traffic levels in Sector 39 required frequent use of a holding pattern that forced turbo-prop aircraft to fly at lower altitudes and forced Albuquerque Center to implement restrictions as far away as the Denver and Kansas City Centers. Descents on KARLO STAR and ascents on DRAKE DP routinely crossed paths in Sector 43, resulting in increased separation or rerouting of aircraft. Sector 43 also controlled an intersection located very near the Luke Air Force Base Radar Approach Control. Because of the intersection's proximity to the military's Radar Approach Control, PHX traffic interfered with military training missions, and air traffic complexity increased generally.

The old procedures also created conflicts in Phoenix TRACON airspace. During both west flow and east flow, the intersection of some routes restricted departures to lower altitudes below the arriving aircraft until clear of the arrival route. These conflicts increased the complexity of controller operations, increased delays, and introduced greater potential for operational errors.

While Sectors 38, 39, and 43 were overloaded, Sector 45 was underutilized. In fact, the overloading and complexity of Sectors 38, 39, and 43 – and thus, of the Phoenix TRACON airspace as well – were due in part to the underutilization of Sector 45.

**B. The Northwest 2000 Plan**

The inefficiencies, workload imbalances and safety concerns at PHX led the FAA to study potential solutions. Then, based on its own assessment of the problems facing U.S. air travel, Congress passed the NAR mandate in 2000. NAR required the FAA to "conduct a comprehensive redesign of the national airspace system" and prepare and submit a report to Congress setting forth "projected milestones for completion of the redesign and . . . a date for completion." 49 U.S.C. § 40103 (notes). The FAA developed the Northwest 2000 Plan in response to both the studies and the NAR.

The Northwest 2000 Plan addressed the aforecited safety and efficiency concerns by modifying some of the arrival and departure routes. The Plan eliminated airspace conflicts within Sector 43 by moving an arrival procedure east and establishing a new departure procedure. It also addressed the complexity within Sector 38 and the underutilization of Sector 45 by modifying the boundary of Sector 45 to accommodate a new departure route which would receive all traffic previously routed on the Sector 38 EAGUL DP. The Plan also changed Sector 39's boundaries and replaced the old FOSSL STAR with two new arrival procedures, which served to eliminate the conflicts created by some of the old holding patterns. The Plan also included development of advanced satellite navigation systems which would further alleviate operational complexity and increase controller flexibility.

These changes began in 1999 and 2000, when the FAA executed a series of "categorical exclusion determinations," "preliminary environmental review checklists," and "noise screening" memoranda designed to authorize the changing of numerous flight departure and arrival paths. The FAA authorized the implementation of five new arrival procedures and six departure procedures.

## C. Environmental Review of the Project

The FAA began its evaluation of the potential impacts of the Northwest 2000 Plan by conducting preliminary environmental reviews for each proposed airspace redesign. The preliminary review processes included application of FAA's Air Traffic Noise Screen Model, which indicated that implementation of the Northwest 2000 Plan would not cause any significant noise or other environmental impacts. Nonetheless, the FAA decided to prepare an EA because it was anticipated that some communities would oppose the proposed changes, and also because the modified routes would overfly two Indian reservations.

The FAA first introduced the Plan to the Phoenix Airspace Users Workgroup in March 2000. In January 2001, the agency issued a Notice of Proposed Action and began preparation of an EA for the Plan. The FAA solicited comments from the general public and federal, state, and local agencies to determine any issues of concern, and thereafter published a Draft Environmental Assessment ("DEA"). In April 2001, the FAA circulated the DEA for public comment and held four public workshops to explain the project, answer questions, and accept written comments on the DEA.

The FAA had initially developed two alternative models for implementation of the Northwest 2000 Plan. After additional analysis and consideration of responses submitted during the DEA process, the FAA determined that it would prepare a supplemental EA in order to develop a third alternative that covered the public's major concerns. In June 2001, the FAA issued a Supplemental Draft EA that presented and analyzed this new alternative. After the agency received extensive public comment and held numerous meetings on the DEA and Supplemental Draft EA, the FAA issued a Final EA and FONSI in December 2001. On the basis of these documents, the FAA determined that it did not need to prepare an EIS because the Northwest 2000 Plan would not significantly affect the environment.

In evaluating the Plan's environmental consequences, the FAA utilized the FAA Integrated Noise Model ("INM")

version 6.0B to assess noise levels at locations surrounding PHX and the seven satellite airports. The noise modeling analysis took into account, *inter alia*, the number of flights, time of day, aircraft type, altitude, and geographic dispersion of flights. The INM produced a series of sound level contours connecting thousands of grid points of equal Day Night Noise Levels ("DNL").

FAA followed its well-established guidelines, which provide that any noise-sensitive area exposed to a noise level increase of 1.5 dB of DNL or more within the 65 DNL contour is considered to be significantly affected, while increases of 3 dB within the 60-65 DNL contour or 5 dB within the 45-60 DNL contour are reportable increases. Courts have long accepted the FAA's DNL standard as the appropriate methodology for assessing the impact of aircraft noise. *See, e.g.*, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 200-01 (D.C. Cir. 1991); *Sierra Club v. DOT*, 753 F.2d 120, 128 (D.C. Cir. 1985); *C.A.R.E. NOW, Inc. v. FAA*, 844 F.2d 1569, 1573 (11th Cir. 1988); *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 189, 197 (7th Cir. 1986). The INM projected that the highest noise level for the Plan would be 48.7 DNL. For both the second and third proposed alternatives, the FAA determined that there would be no significant or reportable noise impacts.

The FAA also supplemented its INM noise modeling in two ways. First, the agency chose specific grid point locations under the flight paths and measured noise impacts and any changes stemming from the no-action or alternatives 2 and 3. The FAA determined that, although noise levels would increase for some points, each point would remain below the threshold of significance. Second, to evaluate the Plan's impact on total noise levels, the FAA also conducted measurements of average ambient noise levels ("Leq") for seven representative locations. The FAA placed one site (Site 1) in Carefree under the proposed SILOW DP. Measurements at Site 1 revealed that the existing ambient noise level, which consists of all background noise – including aircraft and non-aircraft noise – was 44.1 Leq during the day and 37.1 Leq at night. The FAA examined the relative change in aircraft noise caused by the Plan, then evaluated the overall impact of

the change in aircraft noise by performing a logarithmic calculation to account for the actual impact of the project as added to the existing ambient noise levels.

For alternatives 2 and 3, the FAA determined that, although aircraft noise levels would increase at some locations, the overall ambient noise level would not increase at any of the seven monitor locations. For the Cave Creek/Carefree/Spur Cross area, the FAA determined that, although the Plan would increase aircraft noise slightly at Site 1 (by 4.2 dB), when summed logarithmically, the existing ambient level of 44.1 daytime and 37.1 nighttime would not materially change. Accordingly, the FAA concluded that the highest noise level from the project would be 48.7 DNL, and that there would be no significant increase in noise levels in the 65 DNL contour and no reportable increase within the 45-60 DNL contour. Thus, the FAA found that there would be no significant noise impacts for any of the alternatives.

## D. Overflights of Cave Creek, Carefree, and Spur Cross Ranch

Cave Creek, Carefree, and Spur Cross Ranch – the areas with respect to which petitioners claim that the FAA did not give adequate consideration to the Northwest 2000 Plan's noise effects – are located approximately 30 miles northeast of PHX. For decades, during east flow at PHX, portions of Cave Creek and Carefree were located directly below the DRAKE DP. Thus, in east flow, 58 daily departures on that DP overflew Cave Creek, Carefree, and Spur Cross Ranch: From PHX traffic alone, these areas have been located beneath 21,170 annual aircraft operations for decades.

With the implementation of the Northwest 2000 Plan, the 21,170 annual operations from the old DRAKE DP would no longer fly over Cave Creek, Carefree, and Spur Cross. After Northwest 2000, one new procedure – the SILOW DP (in west flow) – will fly over portions of Cave Creek and Carefree. Because SILOW is located further northeast than the old DRAKE DP, the SILOW DP does not overfly Spur Cross Ranch. Thus, the annual flights directly over Spur Cross Ranch decreased by 21,170 with the implementation of the

Northwest 2000 Plan, while overflights of Cave Creek and Carefree increased by 7,300 to a total of 28,400. Also, because the Northwest 2000 Plan raises the average minimum altitude for overflights of Cave Creek, Carefree, and Spur Cross from 15,000 to 17,000 feet, and because new airspace design will allow departures to use unrestricted climbs, areas under the proposed DPs will experience reduced noise levels.

## II. ANALYSIS

We recently explained the applicable standard of review in cases in which an agency has determined that an EIS is unnecessary:

> [The National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA")] requires federal agencies to prepare an environmental impact statement ... for "every ... major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An environmental assessment ... is made for the purpose of determining whether an EIS is required. *See* 40 C.F.R. § 1508.9. "If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken." *Sierra Club v. Peterson*, 230 U.S. App. D.C. 352, 717 F.2d 1409, 1415 (D.C. Cir. 1983)....

> An agency decision that an EIS is not required may be overturned "only if it was arbitrary, capricious or an abuse of discretion." *Sierra Club v. United States Dep't of Transportation*, 243 U.S. App. D.C. 302, 753 F.2d 120, 126 (D.C. Cir. 1985).... Under the long-established standard in this circuit, the court reviews an agency's finding of no significant impact to determine whether:

> > First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a 'hard look' at the problem in

> preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.
>
> 753 F.2d at 125; *see also Maryland-Nat'l Capital Park and Planning Comm'n v. U.S. Postal Serv.*, 159 U.S. App. D.C. 158, 487 F.2d 1029, 1040 (D.C. Cir. 1973).

*Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002).

Petitioners argue that the FAA's actions in this case fail the third step of the *Sierra Club* standard. In particular, petitioners contend that the FAA should be required to prepare an EIS because it failed to make a convincing case for its finding of no significant impact. They argue that the FAA did not make a convincing case, because it failed to consider adequately a number of factors agencies must weigh in determining whether a proposed action will significantly affect the environment. *See* 40 C.F.R. § 1508.8; *id.* § 1508.27(b). Petitioners claim the agency failed to consider adequately the unique characteristics of the affected geographical areas; the cumulative impacts of the Plan; the controversy generated by the environmental impacts of the Plan; the precedent that the plan creates; and the fact that Spur Cross Ranch may be protected by § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). Petitioners' challenge as related to Cave Creek and Carefree differs somewhat from the challenge it mounts to the agency's consideration of the environmental impact on Spur Cross. Thus, we address the distinct challenges in turn.

## A. Cave Creek and Carefree

For Cave Creek and Carefree, the EA and FONSI used well-established methodology which petitioners only nominally challenge. Petitioners do not challenge the guidelines that

the FAA used to evaluate the noise impacts of the Plan, which the agency has employed since 1980 to satisfy its NEPA obligations. *See* 14 C.F.R., pt. 150 app. A. Under these guidelines, FAA actions that do not result in noise level increases of 1.5 dB or more within the 65-or-more DNL contour are, by definition, insignificant under NEPA, because all land use activities at issue here are compatible with noise levels below 65 DNL. *See, e.g.*, *City of Bridgeton v. Slater*, 212 F.3d 448, 459 (8th Cir. 2000) (noting that "aircraft noise level is considered compatible with all land uses" outside the 65 DNL contour). Courts have long accepted the FAA's DNL standard as the appropriate methodology for evaluating the impacts from aircraft noise. *See supra* Part I.C.

The FAA properly applied its regulations to determine whether the Plan's noise impacts would be significant, and the agency determined that there would be neither significant increases within the 65 DNL contour nor reportable increases within the 60-65 or 45-60 DNL contours. Petitioners attempt to deflect focus from the strength of the agency's findings by arguing that the FAA failed to consider adequately a number of factors relevant to whether the Plan will significantly affect the environment. Their contentions do not carry the day.

### 1. Cumulative Impacts

Regulations require the agency to consider the cumulative environmental impacts of any proposed action. 40 C.F.R. § 1508.8. Although petitioners' challenge to the agency's evaluation of the Plan's cumulative impacts is petitioners' most factually intensive argument, it is ultimately unpersuasive – especially considering that the agency's methodology is well established and that its ambient noise measurements take into account most of the problems that petitioners raise.

For example, the ambient noise measurements answer petitioners' claim that the FAA only considered the Plan's "incremental" impacts, rather than adding the incremental impact to the environmental baseline. Petitioners' challenge clearly misconstrues the agency's actual methodology, as the FAA's ambient measurements *do* take into account the environmental baseline. After measuring the environmental baseline, the FAA then calculated the "aircraft portion" of

this ambient level and used the INM to calculate the "aircraft only" noise for each alternative. Thereafter, the FAA evaluated the relative change in noise level attributable to aircraft noise. It then logarithmically calculated how the projected aircraft noise from the project, when added to the ambient baseline, would change the baseline ambient noise levels. This process indisputably examines both the incremental impact of the project as well as the environmental baseline. This case is thus unlike *Grand Canyon Trust*, 290 F.3d 339, to which petitioners attempt to compare it. Unlike the present case, in *Grand Canyon Trust* the FAA failed to conduct ambient monitoring. Petitioners' argument that the FAA did not account for local aircraft operations excluded from the INM is likewise unpersuasive because the ambient measurements considered the local operations' noise impact.

Petitioners next argue that the FAA did not consider the "ceiling effect" that the Northwest 2000 Plan's procedures have on aircraft operations from satellite airports in the Phoenix area. Although the ceiling effect was not specifically discussed in the record, its omission does not render the FAA's decision arbitrary and capricious. Respondents adequately explain the ceiling effect's exclusion from the EA and FONSI:

> Before NW2000, controllers routinely descended satellite arrivals beneath PHX traffic when necessary. For over a decade, these arrivals would then be radar vectored over and near Cave Creek/Carefree.... Post-NW 2000, [they] are similarly descended beneath PHX traffic when necessary. They are then radar vectored over the Cave Creek and Carefree area at the same frequency and altitudes previously on the FERER [an arrival procedure from the north of PHX].... The new JCOBS procedure routes the same number of arrivals as did the FERER and does not lead to any increased overflights of the area....
>
> After NW2000, fewer satellite departures fly over or near Cave Creek/Carefree/Spur Cross Ranch than before the Plan. This is so because some satellite departures are now radar vectored directly

to the west and thus depart in the opposite direction of Cave Creek/Carefree/Spur Cross Ranch. The remaining departures, which at times may be descended below PHX arrivals on the BRUSR [the arrival procedure that replaced the old KARLO STAR], are held there no longer than the pre-NW2000 satellite arrivals were held below DRAKE departures . . . .

Thus, there is no such thing as a "ceiling effect," rather – just as before NW2000 – at times satellite arrivals or departures will need to be held or sequenced to avoid PHX arrivals or departures. Also, as FAA found, the altitude of satellite operations would be the same over Cave Creek/Carefree/Spur Cross with the NW2000 Plan than they were under the old flight paths . . . .

Furthermore, Petitioners' suggestion that the so-called "ceiling effect" impacted FAA's analysis of aircraft altitude for noise purposes is wrong. FAA uses actual flight tracks to develop the INM model runs. Thus, to the extent a satellite operation must descend beneath a PHX operation, the altitude of the satellite aircraft and duration of the descent are factors captured by FAA's analysis of flight track data for use within the INM.

INM modeling accounts for impacts from altitudes of aircraft within flight paths. In its noise analysis, FAA explained that the INM is able to "define descent profiles representative of the proposed procedures" and "also takes into account terrain data to calculate the altitude of aircraft above the ground."

Br. of Respondents at 47-49.

Petitioners also contend that the FAA did not adequately consider the cumulative effects of the Northwest 2000 Plan because the agency failed to account properly for the location of aircraft. In other words, the agency did not analyze vector-related noise impacts as a cumulative impact of the Plan. Again, respondents adequately explain the agency's use of radar vectors:

Petitioners err in criticizing FAA for not analyzing vector-related noise impacts as a "cumulative im-

pact" of the NW2000 Plan. But because classic procedures which include radar vectoring were developed and implemented in the NW2000 Plan, to the extent such procedures cause any impacts, such impacts are direct impacts of the project and should be evaluated as FAA did here.

The EA makes clear that the NW2000 route modifications involve both "classic" flight routes, which use radar vectoring procedures, as well as RNAV routes, which do not. Likewise, within its noise analysis, FAA explained that the arrival and departure routes implemented as part of the NW2000 Plan, and evaluated for noise purposes, "are both classic and area navigation (RNAV) procedures."

All arrival and departure procedures within the Plan were developed (and implemented) as classic procedures where aircraft fly dispersed routes within "courses that are approximately one to eight miles in width * * *." For classic procedures, "dispersion [within the 8-mile corridor] reflects the anticipated vectoring assigned to aircraft as they move through the airspace between enroute fixes." FAA disclosed that radar vectoring procedures are part and parcel of the classic routes developed for the NW2000 Plan. Impacts related to aircraft dispersion due to radar vectoring, therefore, are not *cumulative* impacts but are direct impacts of the project.

FAA evaluated vector-related dispersion as a direct impact of the project by accounting for any such vectoring within its noise modeling. Contrary to Petitioners' suggestions, FAA used the INM model and adequately evaluated noise impacts of aircraft dispersion related to radar vectoring procedures. In fact, FAA's development of its comparative flight paths for the INM model expressly accounted for the existing and projected radar vectoring within classic procedures.

For the No-Action alternative, FAA dispersed the standard arrival and departure definitions published

by PHX and each satellite airport, through radar data depicting the actual locations (including altitudes) flown by aircraft to and from the airports. For Alternatives 2 and 3, FAA developed flight tracks by defining the proposed STAR and DP procedures and dispersing such routes "to reflect corridor widths comparable to those associated with current [classic] procedures."

The EA evaluated noise impacts resulting from use of both RNAV procedures and the classic procedures developed for the NW2000 Plan. For classic procedures, FAA accounted for dispersion impact from use of classic, radar vector procedures by assuming that: (1) 25 percent of the active jet fleet would use classic procedures; and (2) classic procedures and associated vectoring would follow courses between approximately one to eight miles wide. Aircraft dispersion within the eight-mile corridor "reflects the anticipated vectoring assigned to aircraft as they move through the airspace between enroute fixes."

To accurately predict impacts from aircraft noise in the proposed routes, included in the INM was information regarding the traffic distribution patterns and runway usage at PHX and the other airports. FAA utilized actual radar data to accurately depict and model the existing and proposed route utilization and runway usage for noise modeling purposes. Thus, the INM modeling adequately accounted for all aspects of radar vector-related dispersion of aircraft throughout a classic corridor. Based on the results of its noise modeling, FAA reasonably found radar vectoring within the NW2000 classic procedures would cause no significant impacts.

Br. of Respondents at 51-54 (citations omitted).

Finally, petitioners contend that the FAA did not adequately consider the Plan's cumulative impacts, because the model-

ing does not take into account future effects of the Plan's changes. They point out that "sometime between 2010 and 2015, the FAA expects air traffic using Phoenix Airport to increase by 37 percent, compared to today's level of operations." Br. of Petitioners at 38. Thus, petitioners argue that the FAA erred by only modeling the environmental effects of airplane noise through 2005: They argue that the agency should have modeled at least through 2010, and perhaps through 2015. This argument lacks merit. The FAA's decision to model the noise effects for five years into the future was sufficient. It becomes more difficult – as well as increasingly inaccurate – to make projections that stretch even further into the future. For example, we do not know what noise levels planes will produce in the future; they are likely to become less, rather than more, noisy. Because of the difficulties and uncertainties involved in modeling noise levels further than the agency did, modeling through 2005 was perfectly reasonable. Moreover, the present noise levels are so far below the 65 DNL curve that even if airplane-related noise were hypothetically to *triple* between 2005 and 2010 – something that petitioners could not in good faith claim – the resulting noise levels would *still* be consistent with all existing land uses.

### 2. Uniqueness

While regulations require agencies to consider "[u]nique characteristics of the geographic area such as proximity to historical or cultural resources, park lands, . . . or ecologically critical areas" when determining whether to prepare an EIS, 40 C.F.R. § 1508.27(b)(3), there is nothing unique about Cave Creek or Carefree. Petitioners concede that they are residential areas.

### 3. Controversy

Petitioners next argue that an EIS was required because the agency did not adequately consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). "The term 'controversial' refers to cases where a substantial dispute exists as to the size, nature, or *effect* of the major federal

action rather than to the existence of opposition to a use." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982) (emphasis in original; internal quotations omitted). Petitioners' contention that complaints regarding the FAA's modeling of the altitude of overflights constitutes a "controversy" lacks merit because petitioners' evidence is simply insufficient to question the agency's analysis of the "size, nature, or effect" of the proposed action.

This case is quite different from both *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), where the court found that "[t]he EA contains virtually no references to any material in support of or in opposition to its conclusions," and *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 736-37 (9th Cir. 2001), where the court found a substantial controversy because 85% of the 450 comments "urged that the EA's analysis was incomplete and the mitigation uncertain." In this case, petitioners claim that a substantial controversy existed because the FAA received a request to use the Noise Integrated Routing System ("NIRS") Model to evaluate the noise effects of the Plan. We reject the notion that this request presents a substantial controversy, largely because it does little to undercut the FAA's INM model. Petitioners have pointed to nothing casting serious doubt on INM, which, as FAA's preferred model, has been consistently employed as provided in 14 C.F.R. pt. 150 app. A. Even if the NIRS Model were somewhat preferable to the INM in this case – a conclusion we do not embrace – there is no indication that INM's projections are off-base, and no indication that NIRS would find significant or even reportable noise increases in the challenged areas. *See Citizens Against Burlington*, 938 F.2d at 201 (holding that the agency's choice of scientific method to measure noise levels was "obviously not capricious"); *Sierra Club v. DOT*, 753 F.2d at 128 ("It is clearly within the expertise and discretion of the agency to determine proper testing methods.").

### 4. Future Precedent

Finally, petitioners argue that the FAA failed to consider adequately "[t]he degree to which the action may establish a

precedent for future actions with significant effects or represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). They argue that this action creates a clear precedent for other NAR projects not to use EISs in the future.

This argument is completely without merit. The FAA's approval of the Northwest 2000 Plan creates no binding precedent which will control the FAA's future use of EISs for NAR projects. The airspace redesign plans in this case were developed to address the particular circumstances and problems encountered in and around PHX.

## B.   Spur Cross Ranch

Petitioners make two additional sets of arguments directed at the FAA's evaluation of Spur Cross Ranch. These arguments are based on the fact that no noise measurements were taken directly over Spur Cross Ranch, and the contention that Spur Cross Ranch is a uniquely quiet environment that may be a protected resource under § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). Neither of these arguments persuades us that the EA and FONSI are arbitrary and capricious.

### 1.   FAA's Measurements

As it did for Cave Creek and Carefree, the FAA correctly applied a well-established methodology in evaluating the Plan's effect on noise levels in Spur Cross Ranch. Although petitioners argue that the FAA erred by failing to measure noise levels *directly over* Spur Cross, the FAA's methodology was actually applied in a manner that was *favorable* to petitioners. After implementation of the Northwest 2000 Plan, annual flights over Spur Cross Ranch decreased by 21,170. Rather than taking noise measurements in Spur Cross Ranch – which no longer has any direct overflights – the FAA took noise measurements in close proximity to the airplane flight paths. Thus, its methodology may actually *overstate* the Plan's cumulative noise effects. At worst, any noise increase falls within acceptable levels, because the

increased noise level will not be greater than the FAA's measurements indicated.

### 2. Context and Setting of Spur Cross Ranch

Spur Cross Ranch is a relatively quiet environment that may qualify as a "public park, recreation area, or wildlife . . . refuge of national, State, or local significance" under § 4(f). Because of this, petitioners argue that the FAA failed to adequately consider both the "[u]nique characteristics of the geographic area," 40 C.F.R. § 1508.27(b)(3), and whether the proposed action violates "Federal, State or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). We reject petitioners' arguments because the noise levels in Spur Cross Ranch after the Plan's implementation are insignificant.

Because the post-Plan noise levels are insignificant, they will not compromise the activities that take place in Spur Cross Ranch. *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 578 (9th Cir. 1998) (upholding application of the 65 DNL threshold of significance as applied to an Indian reservation which, like Spur Cross Ranch, was located in the desert). Moreover, petitioners are simply wrong in their assertion that the EA does not discuss the visual impact of the flights on Spur Cross Ranch. The EA specifically states:

> Under Alternative 3, no adverse impacts would result and no mitigation measures are required. The impact that would potentially occur (visual presence of aircraft) does not linger in the area and is not permanent . . . , but the potential disruption could have a diminishing effect on a person's expectations of a natural area.

Northwest 2000 Environmental Assessment, Joint Appendix ("J.A.") 926; *see also id.*, J.A. 1001 (responding to a comment addressing this precise issue). This discussion adequately addresses the Plan's visual impact.

Finally, while Spur Cross is a potential § 4(f) resource, the FAA did not err in failing to discuss it as such because the

Plan will not constitute a "use" of Spur Cross. Compliance with § 4(f) proceeds in three stages. First, the FAA must identify which resources are protected. Second, the FAA must determine whether a proposed project will "use" the lands identified. Third, if the project uses the challenged area, the FAA may proceed with the project *only* if there is "no prudent and feasible alternative" and the agency undertakes "all possible planning to minimize harm." 49 U.S.C. § 303(c). Although "noise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a 'use' of that land," *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1507 (D.C. Cir. 1994), petitioners have not made a serious argument that the FAA's plan will have a "significant adverse" impact on the Ranch's existing uses. *Allison v. Dep't of Transp.*, 908 F.2d 1024, 1028 (D.C. Cir. 1990). We have already discussed how noise level changes expected in Spur Cross will be insignificant and will not exceed regulatory thresholds for recreational public parks like Spur Cross Ranch. Thus, the Northwest 2000 Plan does not constitute a "use" of the area, and the FAA should not be required to prepare an EIS on these grounds. *See City of Grapevine*, 17 F.3d at 1507-08; *Communities Inc. v. Busey*, 956 F.2d 619, 624 (6th Cir. 1992).

### III. Conclusion

For the reasons given above, the petition for review is hereby denied.