**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHELLE BARNES, an individual;
PATRICK CONRY, an individual;
BLAINE ACKLEY, an individual;
DAVID BARNES, an individual;
JAMES LUBISCHER, an individual;
OREGON AVIATION WATCH, an
Oregon non-profit organization,
*Petitioners,*

v.

FEDERAL AVIATION
ADMINISTRATION,
*Respondent;*

PORT OF PORTLAND,
*Intervenor-Respondent.*

No. 14-71180

OPINION

On Petition for Review of an Order of the
Federal Aviation Administration

Argued and Submitted October 5, 2016
Portland, Oregon

Filed August 3, 2017

Before: Sidney R. Thomas, Chief Judge, and Richard R.
Clifton and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Federal Aviation Administration

The panel denied a petition for review of a decision of the Federal Aviation Administration ("FAA"), finding that a new runway project at Hillsboro Airport near Portland, Oregon, would have no significant impact on the environment ("FONSI").

The panel held that in adopting the supplemental environmental assessment, issuing the FONSI, and concluding that the project at Hillsboro Airport complied with the requirements of the Airport and Airway Improvement Act, the FAA did not act in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law.

### COUNSEL

Sean Malone (argued), Eugene, Oregon, for Petitioners.

Robert Lundman (argued), Maggie B. Smith, and Andrew C. Mergen, Attorneys, Appellate Section; Sam Hirsch, Acting Assistant Attorney General; Environment and Natural

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Resources Division, United States Department of Justice, Washington, D.C.; Patricia Deem, Office of Regional Counsel, NW Mountain Division, Federal Aviation Administration; Eric Elmore and Daphne Fuller, Office of the Chief Counsel, Federal Aviation Administration, Washington, D.C.; for Respondent.

Jason T. Morgan (argued) and Beth S. Ginsberg, Stoel Rives LLP, Seattle, Washington, for Intervenor-Respondent.

**OPINION**

CLIFTON, Circuit Judge:

This case involves a new runway at Hillsboro Airport, a general aviation airport near Portland, Oregon. We previously considered a challenge to the original environmental assessment done for the new runway project in *Barnes v. United States Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011) ("*Barnes I*"). Although we rejected many of the arguments raised in the prior petition for review, we granted the petition and remanded for further consideration based primarily on concern for the possibility that the new runway would result in a larger number of takeoffs and landings at the airport, a possibility we concluded had not been adequately addressed.

Following remand, a supplemental environmental assessment was prepared. It concluded that the new runway would cause at most a small increase in air traffic and also determined that, even if the runway did induce a growth in traffic, any impact on air quality would be immaterial. The Federal Aviation Administration accepted that assessment

and issued a finding that the new runway would have no significant impact on the environment. Petitioners, five individuals and a non-profit organization, oppose the new runway and challenge the FAA's conclusions. We have jurisdiction pursuant to 49 U.S.C. § 46110(a), and we deny their petition for review.

## I.  Background

Hillsboro Airport ("HIO") is located in the city of Hillsboro in Washington County, Oregon, twelve miles west of downtown Portland. It is owned by Intervenor-Respondent Port of Portland. In terms of airport operations (the sum of takeoffs and landings), it became the busiest airport in Oregon in 2008, surpassing Portland International Airport.[1]

In 2005 the Port undertook to develop a Master Plan for HIO. Among other things, the Plan proposed construction of a new third runway, which would run parallel to the existing primary runway and would be used by small general aviation aircraft. The Plan concluded that adding the new runway would be "the best means available for reducing delays and the undesirable conditions that occur due to delay." The new runway would also allow for separating small, single-engine propeller planes from larger propeller planes and jet aircraft. The modifications were to be funded in part by FAA grants.

The use of FAA funds meant that the environmental effects of the project had to be considered. *See* 40 C.F.R. § 1508.18(a). The Port produced an environmental

---

[1] More background on HIO, its configuration, and the changes proposed by the Port is provided in our prior opinion. *See Barnes I*, 655 F.3d at 1126–29.

assessment ("EA") for the FAA, and the FAA issued a finding of no significant impact ("FONSI") in 2010. *See* 40 C.F.R. § 1508.13. That finding relieved the FAA of the obligation to have a more detailed environmental impact statement prepared. *See* 40 C.F.R. § 1501.4(e).

Opponents of the new runway, including three of the petitioners in this action, petitioned this court for review, arguing, among other things, that the EA did not meet the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq. Barnes I*, 655 F.3d at 1130–31. We rejected many of the opponents' arguments, but we granted the petition and remanded for further consideration. *Id.* at 1143. Although the EA concluded that the new runway would not increase air traffic at the airport, our decision concluded that the EA was inadequate because the FAA could not "point to any documents in the record that actually discusse[d] the impact of a third runway on aviation demand at HIO." *Id.* at 1136. Accordingly, we determined "that remand [was] necessary for the FAA to consider the environmental impact of increased demand resulting from the HIO expansion project, if any." *Id*. at 1139.

On remand, the Port produced a supplemental environmental assessment ("SEA"), which included three different forecasts for demand at HIO. The forecasts predicted at most a small increase in air traffic operations due to the new runway and concluded that pollution generated by any increased traffic would be negligible. The FAA adopted the SEA, concluded that it was unnecessary to prepare an environmental impact statement, and, in 2014, issued a new FONSI. *See* 40 C.F.R. §§ 1501.4, 1508.13; *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998) ("If a FONSI is made, the agency need not prepare an EIS.").

Following the decision of a motions panel of this court to deny Petitioners' motion for an injunction pending consideration of the petition, the Port constructed the runway, and the runway is now completed and open for use.**[2]**

Petitioners now contend that, on remand, the FAA did not fulfill NEPA's requirement to take a "hard look" at the environmental impacts of additional air traffic generated by the new runway. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006). They also argue that the circumstances of the project necessitated preparation of an environmental impact statement. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27. Finally, they contend that the FAA did not comply with the Airport and Airway Improvement Act's requirement to ensure that the new runway was consistent with the plans of the appropriate local agencies. *See* 49 U.S.C. § 47106(a)(1).

## II. Discussion

"Judicial review of agency decisions under NEPA . . . is provided by the [Administrative Procedure Act], which maintains that an agency action may be overturned only when it is 'arbitrary, capricious, an abuse of discretion, or otherwise

---

**[2]** The parties have not addressed whether this development rendered the case moot. We conclude that it did not. In a similar context, we previously held that a NEPA challenge to a completed and fully operational freeway interchange was not moot because the court could conceivably have ordered that the interchange be closed and dismantled. *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000); *see also Feldman v. Bomar*, 518 F.3d 637, 642–43 (9th Cir. 2008) (collecting cases). Potential remedies available in the instant case, including decommissioning the runway, are no less implausible than dismantling a freeway interchange.

not in accordance with law.'" *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)).   In the context of "reviewing an agency's decision not to prepare an EIS under NEPA," we consider "whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant.'" *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1009 (alteration in original) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)).   The FAA's conclusion that a proposed project meets the requirements specified in the Airport and Airway Improvement Act, 49 U.S.C. § 47106, is also reviewed under the arbitrary and capricious standard.   *See City of Dania Beach v. FAA*, 628 F.3d 581, 588 (D.C. Cir. 2010).

A. *Petitioners'    Challenges    to    the    Supplemental Environmental Assessment*

Petitioners argue that the SEA was deficient in a number of respects and that it therefore did not constitute the "hard look" NEPA requires.   We address each of Petitioners' contentions in turn.

1.   Forecasting Methodologies

On remand, the Port produced three forecasts for air traffic growth at HIO: the Unconstrained Forecast, the Constrained Forecast, and the Remand Forecast.

The Unconstrained Forecast modeled air traffic based on socio-economic data without limitations related to the airport's infrastructure.   In other words, the Unconstrained

Forecast predicted how much air traffic HIO would see if it had limitless runways and other facilities. The Unconstrained Forecast predicted that HIO would have 224,260 total aircraft operations in 2016 and 242,680 total aircraft operations in 2021.

The Constrained Forecast modeled air traffic while taking account of HIO's limited runways and assuming that the new runway would not be built. The Constrained Forecast assumed that, if HIO became so crowded that the wait time to use its two then-existing runways became intolerable, then pilots would begin using other airports, and growth at HIO would taper off. The Constrained Forecast determined that, even without the new runway, the delays at HIO would not have reached an intolerable level by 2021, the end of the forecasting period adopted by the SEA. Because a delay-induced curb on operations growth was the only difference between the Unconstrained and Constrained Forecasts, and because such delays were not anticipated during the forecasting period, the Constrained Forecast predicted the same number of operations as the Unconstrained Forecast.

In order to accommodate our direction in *Barnes I* to consider demand induced by the new runway, the SEA also included what it called a Remand Forecast, which incorporated data derived from a survey. In the survey, pilots with planes based at HIO and other airports around Portland estimated whether and by how much they would increase their operations at HIO due to the new runway, the associated reduced delays at peak times, and the increased safety arising from separating single-engine propeller planes from larger planes. The SEA added the increase that the pilots projected to the projections from the Unconstrained Forecast to arrive at the Remand Forecast, which predicted that HIO would see

235,610 operations in 2016 and 254,030 operations in 2021. Accordingly, among the three forecasts, the Remand Forecast predicted the largest air traffic volume. Specifically, the Remand Forecast predicted that HIO would have 11,350 more takeoffs and landings each year with the new runway than it would without the new runway.

The SEA contended that the Unconstrained Forecast, which took account of socio-economic conditions, adequately predicted future demand at HIO assuming the new runway were built. Additionally, the SEA provided extensive analysis about the Remand Forecast. Our primary concern in *Barnes I* was the original EA's lack of a comparison of projected air traffic with and without the new runway. 655 F.3d at 1134 ("The agencies are unable to point to anything in the record showing that they in fact considered the possibility that expanding HIO's capacity would lead to increased demand and increased aircraft operations . . . ."); *id.* at 1136–37. By including, on the one hand, the Constrained Forecast, and comparing it with, on the other hand, both the Unconstrained and Remand Forecasts, the SEA addressed this concern two times over.

Petitioners contend that the Remand Forecast underestimates growth. Specifically, Petitioners claim that the survey used to generate the Remand Forecast did not include a response from Hillsboro Aviation, a pilot training school that Petitioners state is the largest aviation operator at HIO. The FAA counters that Petitioners are mistaken and that Hillsboro Aviation did in fact respond to the survey. The record indicates that Hillsboro Aviation's response was

included in the survey. Accordingly, the challenge to the Remand Forecast is without merit.[3]

The SEA concluded that even the higher activity levels reflected in the Remand Forecast would not have any significant environmental effects. With regard to air quality, for instance, it stated that "the proposed project would either reduce emissions and be *de minimis*, or, if the Remand Forecasts occurred, would slightly increase emissions but remain well below the *de minimis* level." Petitioners challenge specific elements of that conclusion.

2.  Lead Pollution Baseline Measurements

Petitioners argue that, because the SEA did not assess the existing amount of lead in the soil and water in the area surrounding HIO, it did not consider how any lead emissions from increased air traffic might impact the accumulation of lead in the soil and water. Unlike jet fuel used by commercial airlines, fuel used in general aviation may contain lead. Petitioners contend that the SEA therefore "ignore[d] an important aspect" of the impacts of potentially increased air traffic associated with the new runway in violation of NEPA's requirements.

---

[3] In their reply brief, Petitioners contend that, even if Hillsboro Aviation was included in the survey, the survey did not capture all of the likely growth related to pilot training. Petitioners did not raise this argument in their opening brief, and it is therefore waived. *See McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009) ("Because this argument was not raised clearly and distinctly in the opening brief, it has been waived."); Fed. R. App. P. 28(a)(8)(A) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.").

The SEA demonstrated that the new runway would have little effect on lead in the area around HIO. The Remand Forecast estimated that the new runway would result in the annual emission of an additional 0.03 ton of lead in 2016 (from 0.83 ton under the Constrained Forecast to 0.86 ton under the Remand Forecast) and the annual emission of an additional 0.02 ton of lead in 2021 (from 0.90 ton under the Constrained Forecast to 0.92 ton under the Remand Forecast).[4] These predictions represent an increase in lead emissions of less than four percent. The data underlying these forecasts were discussed in great detail in the "air quality technical memorandum" attached to the SEA.

To assess the significance of this increase in lead emissions, the SEA referred to the Environmental Protection Agency's regulations on lead. In certain circumstances, when a federal action would cause the annual emission of more than 25 tons of lead, EPA regulations require a "conformity determination" to evaluate the action's impact on the relevant region's compliance with the national ambient air quality standards ("NAAQS"). 40 C.F.R. § 93.153. The forecasted increase in lead emissions due to the new runway was very small in comparison to the levels of lead emissions that the EPA considers sufficient to necessitate study.

The SEA reasonably determined that any increased air traffic would have virtually no effect on the lead levels in the area around HIO. If a project will have virtually no effect on

---

[4] The reduced amount of pollution attributable to the new runway over the five year period is due to the model's prediction that the new runway will decrease delays and reduce emissions from idling aircraft, thereby partially offsetting emissions from increased operations. The difference in delays with and without the new runway increases with time.

the presence of a pollutant, then it would be pointless to measure or model the presence of that pollutant prior to commencing the project. Therefore, it was not arbitrary or capricious to refrain from conducting additional analyses regarding baseline lead levels in the soil or water.[5]

### 3. Impacts on Children

Petitioners argue that the SEA failed to consider the impact that increased lead emissions may have on children. The SEA included a section titled "Children's Health and Safety Risk," in which it explained that, even with the increased air traffic projected by the Remand Forecast, the air around HIO would remain "well below" the EPA's NAAQS lead limit of $0.15 \ \mu g/m^3$.

Using the FAA's Emission & Dispersion Modeling System, the SEA concluded that the maximum lead concentration in the air around HIO was $0.00405 \ \mu g/m^3$ prior to the construction of the new runway. Using a "sensitivity analysis" that assumed that all emissions occurred near

---

[5] The SEA's analysis in this case is distinguishable from a different analysis we recently rejected on NEPA grounds, in which the Bureau of Land Management analyzed the effects of a proposed open pit mine. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016). The BLM, citing only a completely conclusory statement in an email from an "expert," had "assumed" that the baseline levels for a host of pollutants around the mine was "zero." *Id.* at 1103. The BLM provided no explanation whatsoever justifying its adoption of this assumption. Unlike this case, the issue in the BLM case was not whether the pollutants emanating from the mine would be so negligible that a baseline analysis of pollutants was unnecessary. Moreover, the BLM analysis was grounded in nothing but an unsupported assertion, whereas the report on which the SEA based its conclusion regarding lead emissions from HIO was thorough and rigorous.

ground level, the SEA found a maximum lead concentration in the air around HIO of 0.06567 $\mu g/m^3$. Accordingly, even assuming that all lead emissions from the airport occurred at ground level, the projected lead level in the air around HIO was less than half of the maximum allowed under the EPA's standards. Given these conditions, it was not arbitrary or capricious for the SEA to conclude that an increase in lead emissions of less than four percent would not cause the ambient lead concentrations surrounding HIO to exceed the EPA's lead NAAQS.

The SEA also concluded that the EPA's NAAQS for lead was set at an acceptable level to protect sensitive populations, including children. When it issued its final rule, the EPA explained that the NAAQS for lead was established "to provide increased protection for children and other at-risk populations against an array of adverse health effects, most notably including neurological effects in children, including neurocognitive and neurobehavioral effects." Environmental Protection Agency, National Ambient Air Quality Standards for Lead, Final Rule, 73 Fed. Reg. 66964, 66965 (Nov. 12, 2008). The EPA further stated that the "standards include an adequate margin of safety . . . to address uncertainties associated with inconclusive scientific and technical information [and] to provide a reasonable degree of protection against hazards that research has not yet identified." *Id.* at 66966. When setting this standard, the EPA considered the variety of ways in which people may be exposed to lead, including through water, dust, soil, and food. *Id.* at 66971. It was appropriate for the FAA to defer to the EPA on the factual question of what level of airborne lead is safe for children. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 311–12 (D.C. Cir. 2013) (approving of agency's use of NAAQS in completing NEPA analysis).

4.  Flight Stage Components Included in Lead Emission
    Calculation

Petitioners argue that the SEA did not adequately account
for the various components of a typical flight in its lead
emission calculations.  First, Petitioners contend that the SEA
did not adequately support its estimate for the time it takes for
aircraft to taxi to and from the runway.  The SEA stated that
the taxi times were forecast taking into account HIO's
runway usage, aircraft mix, and weather conditions.  This
explanation does not, as Petitioners contend, represent a
"void," but rather it is a methodology selected by the FAA
and entitled to deference.  *Compare Or. Nat. Desert Ass'n v.
Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010)
("We cannot defer to a void.") *with Nat'l Parks &
Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677,
682 (9th Cir. 2000) ("[T]he FAA's determination is due
deference—especially in areas of agency expertise such as
aviation forecasting.").

Petitioners also argue that, when considering lead
emissions in the air surrounding HIO, the SEA did not
properly consider the altitude at which emissions were
released during the "cruise" phase of flights.  Specifically,
Petitioners contend that the SEA should have applied a
mixing height (the height below which air particles will mix
to become homogeneous) of 3,000 feet.  That is essentially
what the SEA did, as the FAA pointed out in its answering
brief.   The FAA's Emissions and Dispersion Modeling
System ("EDMS"), approved by the EPA, calls for emissions
released above 1,000 feet to be treated as being released
halfway between 1,000 feet and the mixing height.  The SEA
treated those emissions as being released at a height of
619 meters (2,031 feet), which is approximately halfway

between 1,000 feet and the mixing height of 3,000 feet that Petitioners advocate. Petitioners did not say anything further on the subject in their reply.

Petitioners argue separately that the EDMS model did not include lead emissions that occur during the "run-up" phase, when pilots conduct pre-flight checks. The FAA confirmed in its response to comments that it was developing a methodology to measure emissions during the run-up phase but had not yet completed that endeavor, so it continued relying on the existing EDMS methodology in the interim. The FAA is entitled to deference in its decision. *See Nat'l Parks & Conservation Ass'n*, 222 F.3d at 682.

5.  Impacts on Water Quality

Petitioners argue that the SEA did not account for pollution in water and wetlands arising from potential increased air operations. In fact, the SEA discussed the project's impact on water quality and wetlands in detail. Although the section of the SEA discussing water did not specifically address lead emissions, the NAAQS for lead accounts for exposure to lead through water, 73 Fed. Reg. at 66971, and the SEA concluded that any increased lead emissions would be *de minimis* under the NAAQS. Accordingly, the SEA's assessment of the impacts to lead content in water arising from a potential increase in air traffic was not arbitrary or capricious.

6.  Duration of Emissions Forecasting Period

Petitioners argue that the SEA should have published twenty years of emissions projections instead of the ten years it provided. Petitioners contend that the FAA typically

forecasts demand twenty years in advance for long-range planning purposes and note that the FAA prepared such a forecast for HIO. The SEA explained that, consistent with the FAA's typical practices for NEPA analyses, the SEA would rely on forecasts for the period through 2021 because the air traffic for that period was "reasonably foreseeable[,] i.e.[,] . . . likely to occur or probable rather than . . . merely possible."

"The selection of the [temporal] scope of an EIS is a delicate choice and one that should be entrusted to the expertise of the deciding agency." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003). In that case we concluded that, although the Forest Service had data that could have allowed it to forecast further into the future, it was within the agency's discretion to select a three-year window for analyzing the future effects of its action. *Id.* at 962–63. Similarly, it was not arbitrary or capricious for the FAA to determine that, under NEPA, the reasonably foreseeable emission forecasting time frame for this project was five to ten years, even though it had (less precise) demand estimates available in the twenty-year time frame. That was especially true for lead emissions given that the FAA and the EPA are working to create an unleaded aviation fuel for existing piston engine aircraft by 2018. *See Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (concluding that, especially in light of evolving technologies, it was permissible under NEPA for the FAA to model environmental impacts five years in advance, even though the agency possessed demand projections stretching further into the future).

Because the FAA "'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement

of reasons to explain why [the] project's impacts are insignificant,'" we conclude that the FAA took the requisite "'hard look' at the consequences of its actions." *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1009 (first alteration in original) (quoting *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 730).

## B. *Petitioners' Arguments Related to the Significance of the Project*

"An agency must prepare an EIS 'if "substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor."'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008) (omission in original) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998)). Petitioners contend that the significance of the new runway's potential impacts requires the agency to produce an EIS. Although we rejected many of Petitioners' arguments in support of this contention in *Barnes I*, we left open the possibility that Petitioners might prevail on their arguments related to demand induced by the new runway. 655 F.3d at 1140.

Petitioners contend that the new runway will result in increased lead emissions "significantly" affecting public health, especially children's health. *See* 40 C.F.R. § 1508.27(b)(2). However, the SEA concluded that any increase in lead emissions would be "*de minimis*." An environmental impact statement is not required merely because an analysis reveals a potential for a minor impact. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("[I]t does not follow that the presence of some negative effects necessarily rises to the

level of demonstrating a significant effect on the environment.").

Petitioners also contend that the new runway is significant because it involves "unique . . . risks" to children. *See* 40 C.F.R. § 1508.27(b)(5). This is simply a reformulation of the argument regarding children's health discussed above, and it is no more meritorious.

Additionally, Petitioners contend that the new runway is significant because it is near residences and therefore has "unique geographical characteristics." Petitioners refer to 40 C.F.R. § 1508.27(b)(3), which states that evaluating a project's significance includes considering "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." Petitioners provided no reason to conclude that there is anything unique about an airport near a residential area. *See Town of Cave Creek*, 325 F.3d at 331 (rejecting challenge to air traffic rerouting project by observing that "there is nothing unique about Cave Creek or Carefree. Petitioners concede that they are residential areas."). Accordingly, Petitioners have not identified any unique issues requiring an EIS.

Citing 40 C.F.R. § 1508.27(b)(4), Petitioners also contend that the project's effects are likely to be "highly controversial" because of disputes about lead emissions from the airport. Under that regulation, "'controversial' is 'a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (alteration

in original) (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988)).

In support of their argument, Petitioners point to another airport, in San Carlos, California, that was responsible for lead emissions lower than those attributed to HIO but had a higher ambient lead level than the SEA ascribed to HIO. Petitioners reason that this circumstance calls into question the accuracy of the SEA's assessment of the ambient lead level at HIO. To the contrary, the study does not support Petitioners' position because ambient lead levels are the result of emissions from all sources in a region. The non-airport lead sources near HIO were not the same as the non-airport lead sources near the other airport, and Petitioners do not contend otherwise.

Petitioners also claim controversy exists because different analyses identified different levels of lead near HIO. Contrary to Petitioners' argument, the analysis that indicated the highest levels of ambient lead was not the result of a difference of opinion but rather was the result of an error that was corrected in subsequent analyses. There was no "substantial dispute" about the SEA's conclusion that ambient lead levels at HIO were well within the NAAQS. *See Blue Mountains*, 161 F.3d at 1212. Therefore, there was no controversy necessitating an EIS.

## C. *Petitioners' Arguments Related to the Airport and Airway Improvement Act*

The Airport and Airway Improvement Act requires that, before approving a project grant, the FAA must ensure that "the project is consistent with plans (existing at the time the project is approved) of public agencies authorized by the

State in which the airport is located to plan for the development of the area surrounding the airport." 49 U.S.C. § 47106(a)(1). In assessing the plans of the city of Hillsboro, the FONSI considered two city zoning ordinances that established an Airport Use Zone and an Airport Safety and Compatibility Overlay Zone. Petitioner Michelle Barnes succeeded in an effort to invalidate those ordinances in a state court lawsuit, arguing that the avigation easement they included was an unconstitutional taking and that the provisions governing one of the zones involved an impermissible delegation of legislative authority. *Barnes v. City of Hillsboro*, 243 P.3d 139, 141 (Or. Ct. App. 2010).

The city indicated that it planned to resolve the zoning ordinances' infirmities and reinstate the relevant provisions in substance. Accordingly, the zones represented the plans "of public agencies authorized by the State in which the airport is located," 49 U.S.C. § 47106(a)(1), and it was not arbitrary or capricious for the FONSI to consider them.

## III.    Conclusion

In adopting the SEA, issuing the FONSI, and concluding that the project at Hillsboro Airport complied with the requirements of the Airport and Airway Improvement Act, the FAA did not act in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The petition for review is denied.

**PETITION FOR REVIEW DENIED.**