**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTH FORK BAND COUNCIL OF
WESTERN SHOSHONE OF NEVADA;
TE- MOAK TRIBE OF WESTERN
SHOSHONE INDIANS OF NEVADA;
TIMBISHA SHOSHONE TRIBE;
WESTERN SHOSHONE DEFENSE
PROJECT; GREAT BASIN RESOURCE
WATCH,

   *Plaintiffs-Appellants,*

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES
BUREAU OF LAND MANAGEMENT;
GERALD M. SMITH, District
Manager, Battle Mountain Field
Office,

   *Defendants-Appellees,*

    and

BARRICK CORTEZ, INC.,
 *Defendant-intervenor-Appellee.*

No. 09-15230

D.C. No.
3:08-cv-00616-
LRH-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
June 10, 2009—San Francisco, California

Filed December 3, 2009

Before: Mary M. Schroeder, A. Wallace Tashima and
Marsha S. Berzon, Circuit Judges.

15823

Per Curiam Opinion

## COUNSEL

Roger Flynn, Lyons, Colorado, for the plaintiffs-appellants.

Francis M. Wikstrom, Salt Lake City, Utah, for defendant-appellee Barrick Cortez, Inc.

Sambhav N. Sankar, Washington, D.C., for defendant-appellee U.S. Department of Interior.

## OPINION

PER CURIAM:

This is an appeal from the denial of a preliminary injunction in an environmental challenge to a major gold mining project on the side of Mt. Tenabo in Nevada. The mountain has religious significance for Indian tribes.

The plaintiffs-appellants are the South Fork Band Council of Western Shoshone of Nevada, and other tribes and organizations ("the Tribes"). The Tribes originally filed this action against the United States Department of the Interior and its Bureau of Land Management ("BLM") after BLM issued its final environmental impact statement approving the project. The project's developer, Barrick Cortez, Inc., ("Cortez") appeared as an intervenor and is also an appellee.

This court denied the Tribes' emergency motion for an injunction pending appeal, but expedited the briefing and argument of the appeal. The district court's opinion is published at *South Fork Band v. U.S. Dep't of Interior*, __ F. Supp. 2d ___, No. 3:08-cv-00616, 2009 WL 249711 (D. Nev. Feb. 3, 2009), and devotes most of its consideration to claims brought under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4. These claims are not pursued on appeal.

Before us are claims alleging violations of the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. In determining whether a preliminary injunction should issue, we are bound by the Supreme Court's recent opinion in *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365 (2008). We must decide whether the Tribes have shown that they are likely to succeed on the merits of their claims; that they are likely to suffer irreparable harm if a preliminary injunction is denied; that the balance of the

equities tips in their favor; and that an injunction is in the public interest. *Id.* at 374. The Tribes must make each of these showings to be entitled to injunctive relief. *Id.* at 374-76.

To succeed on the merits of their action under the Administrative Procedure Act, the Tribes must show that BLM's action was arbitrary and capricious or contrary to law. *See* 5 U.S.C. § 706(2)(A); *see also Motor Veh. Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). Given the thorough consideration of the project's impact on the Tribes religion in the Environmental Impact Statement ("EIS"), which was approved after more than two years of study and consultation with the Tribes and with the public, we conclude that the Tribes have not satisfied their burden of showing a likelihood of success on the merits of their FLPMA claims. We reverse the denial of injunctive relief on the NEPA claims, however, and remand for the entry of an injunction pending preparation of an EIS that adequately considers the environmental impact of the extraction of millions of tons of refractory ore, mitigation of the adverse impact on local springs and streams, and the extent of fine particulate emissions.

## Factual and Procedural Background

This appeal concerns a proposed gold mining project in the Cortez Mining District, located in Lander County, Nevada on and near Mt. Tenabo, a Western Shoshone sacred site. Gold mining has been a dominant industry in Lander County since the 1950s, and the Cortez Mine has been in operation since 1968. Between 1999 and 2004, miners identified two new gold sources near Cortez's existing mining operations. In 2005, Cortez submitted a proposal for the Cortez Hills Expansion Project, which would extend Cortez's mining activities to the areas of the newly-discovered deposits. As originally proposed by Cortez, the project would have involved ten years of active mining and up to three years of ore processing, followed by site closure and reclamation. The specific activities Cortez proposed included digging a new 850-acre mine pit;

adding facilities for cyanide heap-leach processing; adding areas for disposal of approximately 1.5 billion tons of waste rock; upgrading its mine dewatering systems to remove surface and ground water that would otherwise fill the mines; and building and operating a twelve-mile ore-hauling conveyor system. The project as originally proposed would have disturbed 6,792 acres within the 57,058-acre project boundary. Of the disturbed acreage, 6,571 acres were public land and 221 acres were private land belonging to Cortez.

After Cortez's proposal was submitted, BLM determined that it constituted a "major federal action" for which NEPA required the preparation of an EIS, and that the project was also subject to FLPMA. BLM published a Notice of Intent to Prepare an EIS in December 2005, and over the following two years, BLM studied the potential impacts of the project and consulted with South Fork and other local tribes. BLM published a Draft EIS on October 5, 2007, which evaluated five alternatives: Cortez's proposal, three action alternatives not at issue in this appeal, and a no-action alternative in which Cortez would continue its current mining activities without further expansion. The Draft EIS evaluated these alternatives in light of their impacts on: (1) geology and minerals; (2) water; (3) soils; (4) vegetation; (5) wildlife; (6) woodlands; (7) range resources; (8) paleontology; (9) Native American cultural resources; (10) Native American values; (11) air quality; (12) land use and access; (13) recreation; (14) social and economic values; (15) environmental justice; (16) visual resources; (17) noise; and (18) hazardous materials and solid waste.

After receiving public comments on the Draft EIS, BLM developed and evaluated a fourth action alternative known as the "Revised Cortez Hills Pit Design Alternative." Described in the Final EIS ("FEIS") published on October 3, 2008, this alternative involved smaller expansions to Cortez's existing mining pits and waste rock disposal areas, a larger underground mining component, and smaller heap-leach facilities.

BLM's Record of Decision ("ROD"), published on November 12, 2008, adopted the Revised Cortez Hills Pit Design Alternative and required Cortez to comply with the environmental protection measures described in Cortez's original proposal and with all mitigation measures listed in the FEIS. The agency concluded that, with these safeguards, there would be no "unnecessary or undue degradation of the public lands," and therefore no violation of FLPMA. FLPMA provides in relevant part that agencies such as BLM must take action to prevent "unnecessary or undue degradation," which is defined as harm to the environment that is either unnecessary to a given project or violates specified environmental protection statutes. See 43 U.S.C. § 1732(b); 43 C.F.R. § 3809.5.

On November 20, 2008, the Tribes filed a complaint against the Department of the Interior and BLM in the District of Nevada. Cortez intervened as a defendant. The Tribes moved for a preliminary injunction. After holding a hearing, the district court first issued a denial from the bench and then filed a published opinion denying the injunction on February 3, 2009. *See South Fork Band*, 2009 WL 249711.

The Tribes filed a Notice of Appeal on February 6, 2009, and a few days later, the district court denied South Fork's motion for a stay pending appeal. On February 18, 2009, this court denied an emergency motion for an injunction pending appeal, but ordered briefing and argument expedited.

## Discussion

### I.  FLPMA Claims

The primary claims that the Tribes presented in the district court related to the exercise of their religion. The Tribes claimed in the main that the project would violate RFRA because it would create a substantial burden to the exercise of their religion. RFRA prohibits governmental entities from

imposing substantial burdens on the exercise of religion, even if such burdens arise from a rule of general applicability, unless the government can demonstrate that the rule is both in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(a)-(b). Although the district court agreed with the Tribes that they had standing to bring the RFRA claim and that RFRA applies to the use and management of the government's own land, *see South Fork Band*, 2009 WL 249711, at *4-12, the court denied the RFRA claims on the merits, concluding that the Tribes had not shown there was a likelihood of success of establishing a substantial burden on the exercise of the Tribes' religion, *id.* at *12-14. The court stressed that the Tribes would continue to have access to the areas that were identified during consultation with the Tribes as having the most religious significance. The Tribes have not appealed the denial of preliminary injunctive relief on the RFRA claims.

**[1]** The Tribes do appeal the denial of injunctive relief on a FLPMA claim that is substantially the same as the RFRA claim, but is cast in procedural rather than substantive terms. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006) ("The FLPMA is primarily procedural in nature, and it does not provide a private right of action."). FLPMA creates a duty on the part of agencies like BLM to take action to prevent "unnecessary and undue degradation of the lands." 43 U.S.C. § 1732(b). For the purposes of this case, "unnecessary or undue degradation" is defined as any harmful activity that is either not "reasonably incident" to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection. 43 C.F.R. § 3809.5.

**[2]** To support the FLPMA claim, the Tribes rely heavily upon Executive Order No. 13007 ("EO 13007"), which imposes an obligation on the Executive Branch to accommo-

date Tribal access and ceremonial use of sacred sites and to avoid physical damage to them. *See* 61 Fed. Reg. 26771 (May 24, 1996). The district court expressly recognized that BLM was required to comply with the Executive Order. *South Fork Band*, 2009 WL 249711, at *16 n.9. After reviewing the extensive study that the agency had made of the sacred sites and their uses, however, the court concluded that the Tribes failed to show BLM's conduct of the study was arbitrary, or that BLM violated any duty under EO 13007 when it found the project would neither harm areas identified during the study as sacred, nor materially affect access to those areas. *Id.*

In this appeal from the denial of injunctive relief, the Tribes do not question the sufficiency of BLM's consultation with its tribal consultants or the adequacy of BLM's study of the potential effects of the project on the Tribes' religious uses and practices. The Tribes contend that, on the basis of its consultation and study, the BLM arbitrarily focused on the specific sites identified during the study. According to the Tribes, the BLM should have treated the entire mountain as sacred to the Tribes.

It is true that the extensive record of consultation with the Tribes contains references to the entire mountain as being a sacred site. There are, however, many more specific references to the particular sites on the mountain that are used for religious observance. These significant sites include the top of the mountain, the White Cliffs immediately below the top of the mountain, the Pediment area of piñon-juniper groves on the slope of the mountain, the Shoshone Wells, and the Horse Canyon.

[3] In the EIS, BLM concluded that access to and use of those more discrete sites for cultural and religious observance would not be impeded by the project as approved, and the Tribes do not dispute that conclusion. The Tribes also do not articulate the manner in which they seek agency accommodation for the entire mountain. EO 13007 refers to protecting the

ceremonial uses of sacred sites. *See* Fed. Reg. 26771 (May 24, 1996) (agencies shall "accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and . . . avoid adversely affecting the physical integrity of such sacred sites.")

Not only did the study of the project's effects extend over two years, but the EIS devoted over seventy pages to its discussion of BLM's consultation with the Tribes concerning their religious practices. As a result of BLM's consultation and recognition of the need to accommodate religious practices, the original scope of the project was reduced. Moreover, and significantly, the EIS stated that the BLM would continue consulting with the Tribes regarding the project's impact on their religious practices throughout the life of the project.

**[4]** We see no basis to disturb the district court's conclusion that the Tribes failed to demonstrate a likelihood of success in establishing any arbitrary or capricious agency action in relation to BLM's obligation under EO 13007 to accommodate the Tribes' need for access to and use of religious sites.

The Tribes' remaining FLPMA claim is that BLM acted arbitrarily and capriciously by failing to find an unnecessary or undue degradation of scenic resources as a result of the mining operation. According to the record, BLM has a four-level system of classifying visual impacts due to mining projects. Class I areas are the most highly protected areas, while Class IV areas allow the most visual impact.

**[5]** The areas affected by the mining project in this case were designated by BLM as belonging to Classes III and IV. BLM determined that some of the mining facilities would satisfy the visual impact standards associated with their particular classification, either during the life of the project or after reclamation of the site. Other facilities, however, were deemed unlikely to meet the relevant visual impact standards, but the agency determined that the adverse visual impacts

were not significant enough to justify disapproving the project. The Tribes fail to point to any relevant action on BLM's part that was arbitrary or unreasonable. We will not second-guess the agency's weighing of the compliant and non-compliant visual resource areas in light of its experience and expertise. *Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009). We affirm the district court's determination that the Tribes failed to show a likelihood of succeeding on their FLPMA claims.

## II.   NEPA Claims

**[6]** NEPA requires that all federal agencies prepare, for every major federal action significantly affecting the quality of the human environment, a "detailed statement . . . on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332(C). An adequate EIS is essential to informed agency decision-making and informed public participation, without which the environmental objectives of NEPA cannot be achieved. *See* 42 U.S.C. § 4331(A); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (discussing NEPA's effort to infuse "a broad national commitment to protecting and promoting environmental quality" into "the ongoing programs and actions of the Federal Government").

### Ore Transportation

The Tribes claim BLM violated NEPA by failing to analyze the air quality impacts of the transportation of ore to an off-site processing facility. BLM estimates in the EIS that this mine expansion will make five million tons of refractory ore available for extraction. It will be transported 70 miles to the Goldstrike facility for processing, in two shipments per day, every day, for ten years. The processing of that refractory ore will result in the release of some quantity of mercury, a hazardous air pollutant. The transport of the ore, the Tribes allege, will negatively impact air quality. BLM now maintains, nonetheless, that these environmental impacts need not

be discussed in the EIS, because no increase in the rate of toxic ore shipments is proposed, and the off-site facility is permitted under the Clean Air Act.

**[7]** The air quality impacts associated with transport and off-site processing of the five million tons of refractory ore are prime examples of indirect effects that NEPA requires be considered. The Council on Environmental Quality regulations define indirect effects as those "caused by the action, [and] later in time or further removed in distance, [but] still reasonably foreseeable." 40 C.F.R. § 1508.8(b). An agency must consider them. 40 C.F.R. § 1502(b).

BLM is incorrect in asserting that these effects need not be considered simply because no change in the rate of shipping and processing is forecast. That may be so, but the mine expansion will create ten additional years of such transportation that is, ten years of environmental impacts that would not be present in the no-action scenario.

Moreover, even on a year-to-year basis, there has been no consideration of the environmental impact of the transportation and processing of the refractory ore. BLM's argument to the contrary depends on the assumption that, because off-site processing is ongoing, these impacts must have been analyzed in a NEPA document already. But that assumption is baseless: there is no indication that these impacts were properly considered at any time, even on a year-to-year basis.

Appellees make several arguments in defense of the omission. First, Cortez asserts that the mercury impacts *are* discussed in the EIS, citing a map that shows aggregated mercury emissions from all gold mines in the state as a percentage of total mercury emissions. A close examination of the EIS belies the claim. The EIS does not indicate that BLM accounted for the mercury emissions of the separately owned, off-site Goldstrike facility in preparing this analysis.[1] In any

---

[1]To the contrary, it states that "the area for air quality encompasses the area within the project boundary and the area within 10 kilometers (km)

event, the cited figure sheds no light on the specific effect at issue—the environmental impact of processing ore from this project. *See Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004) (holding that a general discussion of an environmental problem across a large area did not satisfy NEPA).

In the alternative, Cortez asserts that the draft EIS for a different mine expansion—the Betze Pit Expansion—satisfies BLM's responsibilities under NEPA. It does not suffice. Cortez does not show that any effects of the Cortez expansion were considered in the Betze EIS. We have never held that the analysis of *similar* effects for a separate project excuses the failure to consider significant environmental impacts in an EIS. Though "tiering" to a previous EIS is sometimes permissible, the previous document must actually discuss the impacts of the project at issue. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 810 (9th Cir. 1999) (holding that reliance on the EIS accompanying an earlier planning document was improper because it did not discuss the subsequent specific project in detail). The mere existence of an entirely separate draft EIS, discussing a similar issue with regard to a different project, but without any indication that it discussed the specific environmental impacts at issue, cannot satisfy NEPA.

Finally, BLM argues that the off-site impacts need not be evaluated because the Goldstrike facility operates pursuant to a state permit under the Clean Air Act. This argument also is without merit. A non-NEPA document—let alone one prepared and adopted by a state government—cannot satisfy a federal agency's obligations under NEPA. *Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989, 998 (9th Cir. 2004).

---

(6.2 miles) of the proposed project. The cumulative effects study area encompasses the Crescent Valley and Grass Valley hydrographic basins." The Goldstrike facility, located 70 miles away, and north of the Humboldt River, is outside of the "study area."

**[8]** BLM's failure to consider the transport and processing of five million tons of refractory ore over a ten-year period shows that it did not take the requisite "hard look" at the environmental impacts of the proposed project.

## Mine Dewatering

The Tribes contend the BLM failed to conduct an appropriate mitigation analysis with respect to the environmental consequences of mine dewatering. The extensive removal of groundwater implicit in this project is expected to cause some number of local springs and streams to dry up. At least fifteen springs are not expected to recover within 100 years.

**[9]** As the EIS concedes, these are significant environmental harms. Though NEPA, of course, does not require that these harms actually be mitigated, it does require that an EIS discuss mitigation measures, with "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Methow Valley*, 490 U.S. at 352.

**[10]** An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. *Compare Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1381 (9th Cir. 1998) (disapproving an EIS that lacked such an assessment) *with Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000) (upholding an EIS where "[e]ach mitigating process was evaluated separately and given an effectiveness rating"). The Supreme Court has required a mitigation discussion precisely for the purpose of evaluating whether anticipated environmental impacts can be avoided. *Methow Valley*, 490 U.S. at 351-52 (citing 42 U.S.C. § 4332(C)(ii)). A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination.

**[11]** Although the District Court's written order finds that the EIS discusses the effectiveness of each mitigation mea-

sure, close inspection reveals that the EIS does not in fact assess the effectiveness of the mitigation measures relating to groundwater. It states only, "Feasibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan." Nothing whatsoever is said about whether the anticipated harms could be avoided by *any* of the listed mitigation measures. This discussion is inadequate.

BLM argues that an effectiveness discussion was not required because it is impossible to predict the precise location and extent of groundwater reduction, and that problems should instead be identified and addressed as they arise. But NEPA requires that a hard look be taken, if possible, *before* the environmentally harmful actions are put into effect. *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001).

**[12]** In this instance, the EIS states that BLM has identified fifty perennial springs and one perennial creek that are the most likely to dry up, though among these it is impossible to "conclusively identify specific springs and seeps that would or would not be impacted." That these individual harms are somewhat uncertain due to BLM's limited understanding of the hydrologic features of the area does not relieve BLM of the responsibility under NEPA to discuss mitigation of reasonably likely impacts at the outset. *See National Parks*, 241 F.3d at 733 ("lack of knowledge does not excuse the preparation of an EIS; rather it requires [the agency] to do the necessary work to obtain it.") Even if the discussion must necessarily be tentative or contingent, NEPA requires that the agency give some sense of whether the drying up of these water resources could be avoided.

### Particulate Emissions

There is also a claim with regard to particulate emissions. Prior to 2007, it was a common governmental environmental practice to use $PM_{10}$ emission modeling as a surrogate for

determining emission of smaller $PM_{2.5}$ particulate matter. In 2007, the EPA disallowed the practice. *See* 72 Fed. Reg. 20568, 20600 (Apr. 25, 2007). In this case, the BLM indisputably did not do separate modeling for the $PM_{2.5}$ emissions when the draft EIS for the project was being prepared. It used $PM_{10}$ emissions modeling as a surrogate. When it was brought to the BLM's attention during the 2007 comment period that, as of 2007, such surrogate modeling was no longer allowed by the EPA, the BLM gave a reasoned explanation of why separate modeling for $PM_{2.5}$ emissions was not necessary here. It said that $PM_{2.5}$ emissions are generally 15% of the $PM_{10}$ emissions, and that on the basis of the $PM_{10}$ emission modeling that was conducted for this project, the $PM_{2.5}$ emissions were well within EPA tolerances. The district court concluded that the Tribes' challenge to the study of $PM_{2.5}$ emissions lacked any probability of success because the NEPA analysis was thorough, and the agency responded specifically and in detail to the comment it received on the draft EIS.

On appeal, the Tribes stress, however, that the EPA, as early as 2005, announced technical difficulties underlying the surrogate modeling policy, *see* 70 Fed. Reg. 65984, 66043 (Nov. 1, 2005), and in 2007 renounced the use of $PM_{10}$ particulate emissions as a surrogate for $PM_{2.5}$ emissions. The Tribes contend that the BLM's reliance on the surrogate analysis was contrary to 2007 EPA requirements, and thus contrary to law.

[13] The study that BLM did for this project was in large part conducted before 2007, when the surrogate analysis it used was appropriate. Because the BLM must revise its study of the environmental consequences of this project as a result of this litigation, it should do separate modeling for $PM_{2.5}$ particulate emissions.

## Scope of Injunction

[14] For the foregoing reasons, we agree with the district court that the Tribes have not established a likelihood of suc-

cess on the merits of their FLPMA claims, but hold they have established a likelihood of success on the NEPA claims. Such a showing is required for a grant of preliminary injunctive relief. In addition, the party seeking such relief must establish that it "is likely to suffer irreparable harm in the absence of preliminary relief that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 1295 S.Ct. 374. Plaintiffs have shown a likelihood of success on the NEPA claims because there was inadequate study of the serious effects of processing refractory ore and exhausting scarce water resources. The likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high. Indeed the district court did not question the irreparable environmental harm threatened by this massive project, and that will be visited most directly on the plaintiffs. The resulting hardship asserted by Cortez and the government is cast principally in economic terms of employment loss, but that may for the most part be temporary. Given the narrow scope of our holding, which rejects the broader FLPMA contentions, the balance of hardship favors the appellants. As to the public interest, Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest.

## Conclusion

The order of the district court denying preliminary injunctive relief is AFFIRMED in part and REVERSED in part. The matter is REMANDED for entry of injunctive relief consistent with this opinion with each party to bear its own costs.